**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLARE MILNE, by and through
MICHAEL JOSEPH COYNE, her
receiver,

*Plaintiff-Appellant,*

v.

STEPHEN SLESINGER, INC.,

*Defendant-Appellee.*

No. 04-57189

D.C. No.
CV-02-08508-FMC

OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
September 13, 2005—Pasadena, California

Filed December 8, 2005

Before: J. Clifford Wallace, Barry G. Silverman, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

**COUNSEL**

David Nimmer, Los Angeles, California, argued the cause for the plaintiff-appellant. With him on the briefs were Elliot Brown and Bryce Gee.

Roger L. Zissu, New York, New York, argued the cause for the defendant-appellee. With him on the briefs were Patrick T. Perkins, David Donahue, Correne Kristiansen, and Jerome B. Falk, Jr.

**OPINION**

CALLAHAN, Circuit Judge:

This copyright action arises from a termination notice sent by the appellant to the appellee, seeking to recapture rights to various characters created by her grandfather, Alan Alexander Milne, who authored the "Winnie-the-Pooh" children's books. Milne originally granted various rights in those works to the appellee in 1930. Then, in 1983, due to a change in copyright law in 1976, Milne's heirs considered terminating the 1930 grant outright, but instead entered into a new agreement that revoked the original grant and re-issued rights in the works to the appellee. The appellant seeks to invalidate the 1983 agreement based on 1998 legislation. The 1998 legislation only authorizes the termination of copyright agreements executed before 1978. Because the 1983 revocation and re-grant were valid, we affirm the district court's decision.

# I

## A.   Historical & Regulatory Background

As part of the enumerated powers vested in the federal government, the Constitution provides Congress with the power "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to this authority, Congress enacts copyright legislation.

The first enactment of concern in this case is the 1909 Copyright Act. Act of Mar. 4, 1909, ch. 320, § 23, 35 Stat. 1075 (1909). This enactment responded to authors' complaints that the existing protection term was inadequate because many authors were outliving the protection and thereby being denied the proper fruits of their labor. *See* Arguments on S. 6330 & H.R. 19853, Before the Comms. on Patents, 59th Cong., 1st Sess. 116-21 (1906) (statement by Samuel Clemens (a/k/a Mark Twain) asserting that the term of protection was not long enough). Congress addressed those complaints by extending the renewal period from 14 years to 28 years, making copyright protection possible for a total of 56 years. Act of Mar. 4, 1909, ch. 320, § 23, 35 Stat. 1075 (1909).

Almost seven decades later, Congress enacted the 1976 Copyright Act, which forms the foundation of current copyright law. The two-term structure of a fixed term followed by a renewal term was eliminated. *See* Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (1976) (codified at 17 U.S.C. §§ 101-808). In its place, Congress established a single term for all copyrights created after January 1, 1978; the maximum 56-year term under the 1909 Act was replaced with a term of the author's life plus 50 years. 17 U.S.C. § 302(a). Works published or registered before January 1, 1978 would be protected for a maximum of 75 years from the date of pub-

lication or 100 years from the date of creation, whichever was less. 17 U.S.C. § 303.

On October 27, 1998, President Clinton signed into law the Sonny Bono Copyright Term Extension Act of 1998 ("CTEA"), Pub. L. No. 105-298, 112 Stat. 2827 (1998) (codified at 17 U.S.C. §§ 108, 203, 301-304). As its name suggests, the statute further expanded the term of copyright protection, extending the term of all existing and future copyrights by a period of 20 years. Specifically, Congress broadened the term of copyright protection prospectively to works created after its effective date from the life of the author plus 50 years to the life of the author plus 70 years.[1] 17 U.S.C. §§ 302(a), 304(a)-(b). The statute also enlarged the term of protection retroactively to previously granted copyrights, extending their term to a maximum of 95 years. *Id.*

One of the purposes of the CTEA was to harmonize our copyright term with that of the European Union because, without the change, U.S. authors would receive 20 fewer years of protection than their European counterparts. *See* 141 Cong. Rec. S3390-92 (daily ed. Mar. 2, 1995) (statement of Sen. Orrin Hatch); *see also* 141 Cong. Rec. E379 (daily ed. Feb. 16, 1995) (statement of Rep. Carlos Moorhead). This threatened to cost the United States vast amounts of revenue and its favorable position in the global intellectual-property market. *See id.* Another reason behind the extension was to provide greater protections for authors and two succeeding generations of their heirs. Sen. Orrin Hatch, *Toward a Principled Approach to Copyright Legislation at the Turn of the Millennium*, 59 U. Pitt. L. Rev. 719, 733-34 (1998). The end

---

[1] In the case of a work made for hire — which is "prepared by an employee within the scope of his or her employment or . . . specially ordered or commissioned for use as a contribution to a collective work" (17 U.S.C. § 101) — Congress extended the term of protection from 75 to 95 years from the year of the work's first publication, or a term of 120 years from the year of its creation, whichever expires first. 17 U.S.C. § 304(a)-(b).

result is that works that otherwise would have entered the public domain, such as the works at issue in this litigation, were protected for an additional 20 years. Thus, it appears that no copyrighted work will enter the public domain for the next 13 years or so, until January 1, 2019.

## B.   Factual Background

In the 1920s, Alan Alexander Milne ("the author") created in his classic children's books the characters of the boy Christopher Robin and his stuffed bear, Winnie-the-Pooh, as well as their friends Eeyore, Owl, Piglet, Rabbit, Kanga, Roo, and Tigger. Four of those works are involved in this action: (1) *When We Were Very Young*; (2) *Winnie-the-Pooh*; (3) *Now We Are Six*; and (4) *House at Pooh Corner* (collectively, "Pooh works"). U.S. copyrights in the Pooh works were registered between 1924 and 1928, and renewed between 1952 and 1956.[2]

Entranced by the then-newly published *House at Pooh Corner*, a New Yorker by the name of Stephen Slesinger boarded a boat for England with the hope of persuading the author to let him license the rights to the Pooh works for trade purposes back home. Slesinger was a television-film producer, creator of comic-book characters, and pioneer in the licensing of characters for children.

In 1930, the author entered into an agreement with Slesinger, granting Slesinger exclusive merchandising and other rights based on the Pooh works in the United States and Canada "for and during the respective periods of copyright and of any renewal thereof to be had under the Copyright Act[.]" In return, the author received a share of royalty income earned by Slesinger, ranging from three percent of wholesale sales to 67 percent of Slesinger's receipts, as well as an advanced pay-

---

[2]The 1909 Copyright Act was in effect when the Pooh works were copyrighted in the 1920s and upon their renewal in the 1950s.

ment against those royalties. After the agreement's execution, Slesinger created defendant-appellee Stephen Slesinger, Inc. ("SSI"), to which he transferred his rights in the Pooh works.

In 1956, the author passed away and was survived by his widow and their son, Christopher Robin Milne. The author's will bequeathed all beneficial interests in the Pooh works to a trust for the benefit of his widow during her lifetime ("Milne Trust"), and, after her death, to other beneficiaries ("Pooh Properties Trust"), which included his son, Christopher, and Christopher's daughter, Clare. Clare is the author's sole grandchild and the plaintiff-appellant in this case.

In 1961, SSI granted exclusively to Walt Disney Productions ("Disney")[3] the rights it had acquired in the 1930 grant, and Disney agreed to pay certain royalties to SSI. Around the same time, Disney also entered into a similar agreement with the author's widow and the Milne Trust, granting Disney exclusive motion-picture rights, foreign-merchandising rights, and other exclusive rights in the Pooh works in exchange for royalties.

In 1971, the author's widow passed away and, in 1972, her beneficial interests under the Milne Trust were assigned to the Pooh Properties Trust in accordance with the author's will. This meant that the Pooh Properties Trust would receive the author's copyright interest in the Pooh works plus the royalties payable under the 1961 Milne-Disney agreement.

Then came the 1976 Copyright Act and, with it, an extended renewal term of copyright protection. Pub. L. No. 94-553, 90 Stat. 2541, § 304(a) (1976). Most relevant to the Pooh Properties Trust was the provision that gave the author or his heirs an opportunity to benefit from the extended renewal term. *Id*. Specifically, this new statute enabled an

---

[3]While Disney joined this case as a co-plaintiff in the proceedings below, Disney is not a party to this appeal.

author or his heirs to terminate a grant of rights to a copyrighted work made by the author or his heirs to a third party prior to the statute's effective date of January 1, 1978. 17 U.S.C. § 304(c).

In 1983, faced with the possibility that Christopher might seek to terminate the rights Disney had received in 1961 from SSI, Disney proposed that the parties renegotiate the rights to the Pooh works. Christopher accepted Disney's proposal and, using the bargaining power conferred by his termination right, negotiated and signed on April 1, 1983 a more lucrative deal with SSI and Disney that would benefit the Pooh Properties Trust and its beneficiaries.

The new agreement acknowledged the 1930 grant and the 1961 assignment of rights to Disney, and observed that although ownership of the copyrights had been transferred to the Pooh Properties Trust, there were "disputes [which] had existed[.]" Recognizing that the author's heir, Christopher, may well have a right of termination under the 1976 Copyright Act, the agreement declared that the parties were resolved to "clarify certain aspects of their contractual arrangements and to settle revised agreements." Christopher therefore agreed not to seek termination of the existing arrangements in return for executing the new agreement. The agreement then provided for the revocation of the 1930 and 1961 agreements in favor of the new agreement, followed by the re-granting (on the same page) of the rights in the Pooh works to SSI.[4] In exchange for royalties, SSI turned around and granted Disney the radio, television, motion-picture, and merchandising rights to those works.

One result of the 1983 agreement was an increase of the amounts that the Pooh Properties Trust received over the

---

[4]The 1983 agreement specifically stated: "The Trustees hereby assign, grant, and set over unto [SSI] all of the rights in and to [the Pooh works] which were transferred to [Slesinger by virtue of the 1930 grant.]"

sums that had been payable under the 1961 Milne-Disney agreement. The Pooh Properties Trust now received double SSI's share of the royalties, compared to about half of SSI's share before the 1983 agreement. Thus, the renegotiations between the parties resulted, by some estimates, in a net gain of hundreds of millions of dollars to the Pooh Properties Trust, which included Clare as a prime beneficiary.

On November 4, 2002, motivated by the recent enactment of the CTEA and its favorable treatment of authors' heirs, Clare set out to recapture the rights to the Pooh works. Toward that end, she served SSI with a notice of termination, which referenced November 5, 2004 as the effective date for termination of the 1930 grant of rights to SSI. The same day that she served the termination notice, Clare entered into an agreement with Disney, assigning the rights expected to revert to her in 2004.[5]

## C.   Procedural Background

On November 5, 2002, the day after she served the termination notice, Clare joined by Disney, commenced this action in the district court, seeking a declaration that her termination notice was valid and effectively terminated SSI's rights in the Pooh works. Thereafter, SSI filed a motion for judgment on the pleadings or, alternatively, for summary judgment. SSI asserted, *inter alia*, that Clare's termination notice was invalid because the 1930 grant of rights targeted by the termination notice had already been revoked under the 1983 agreement, and therefore was no longer in existence and not subject to statutory termination under the CTEA. In turn, Clare filed a cross-motion for summary judgment, seeking a declaration that the termination notice was valid and that SSI's rights in the Pooh works would terminate on November 5, 2004.

---

[5]Under Clare's reversion agreement with Disney, Disney agreed to fund the instant litigation for her.

On May 8, 2003, the district court issued an order granting in part and denying in part SSI's motion, and denying Clare's cross-motion. In essence, the district court declared the termination notice to be invalid by ruling in SSI's favor regarding Clare's declaratory-relief claim.[6]

Clare subsequently moved the district court to enter a final judgment under Federal Rule of Civil Procedure 54(b) because all claims related to her had been resolved. The district court eventually granted Clare's motion, and entered judgment as to Clare on December 6, 2004. She filed a timely appeal from that judgment. *See* FED. R. APP. P. 4(a).

## D. The District Court's May 8, 2003 Order

When considering the parties' motions, the district court asked the question that lies at the very heart of the parties' dispute: "Should the 1983 SSI Agreement be treated as a pre-1978 agreement to be governed by the [CTEA's] termination provisions of 17 U.S.C. § 304?" Answering the question in the negative, the district court held that the parties' 1983 agreement itself revoked the grant of rights under the 1930 agreement that Clare's notice sought to terminate, and that the grant made to SSI under the 1983 agreement was not subject to termination under the CTEA. In reaching its ruling, the district court rejected Clare's argument that the 1983 agreement was merely an extension of the 1930 grant. The court further reasoned that the CTEA's termination provisions apply only to grants made prior to 1978. The court also opined that the Copyright Acts did not alter the power of private parties to contract and that the 1983 agreement "was created in order to

---

[6]Other issues were left pending in the district court. For example, the court had yet to rule on the validity of a copyright termination notice served by the granddaughter of the Pooh works' illustrator. Also before the court was SSI's declaratory-relief counterclaim, asserting that Disney was obligated to pay royalties to SSI. Those further proceedings are not at issue in this appeal.

protect SSI and Disney from a termination of the rights granted to them."

In addition, the district court was not persuaded by Clare's argument that "a grantee may not subvert the statutory rule against obtaining a new grant prior to termination of the original grant . . . unless there is at least a moment [of freedom] when the grantor is bound under neither the prior nor the new grant." The court noted that although "§ 304(c)(5) [and] § 203(a)(5) . . . provide that termination of a grant may be effected 'notwithstanding any agreement to the contrary,' . . . [s]ection 304 does not apply[ ] because this is a post-1978 agreement, and § 203 does not apply[ ] because the grant in question was not made by the author" (quoting 17 U.S.C. §§ 203(a)(5), 304(c)(5)). Thus, the court concluded that the 1983 agreement was a new contract, effective after January 1, 1978, and that Clare's termination notice was invalid.

## II

This court reviews de novo an award of judgment on the pleadings. *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004); *Underwood Cotton Co., Inc. v. Hyundai Merch. Marine, Inc.*, 288 F.3d 405, 407 (9th Cir. 2002). " 'A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law.' " *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quoting *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)).

## A.　Right of Termination Under the CTEA

Clare argues that she properly terminated SSI's rights in the Pooh works. We hold that the district court's contrary conclusion is correct.

In a copyright case, as in most cases, the language of the statute provides the starting point for our analysis. *Cmty. for*

*Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989); *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164 (1985). The CTEA provides in relevant part:

> In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act [effective October 27, 1998] for which the termination right provided in subsection (c) [of this section] has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, *executed before January 1, 1978*, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination. . . .

17 U.S.C. § 304(d) (emphasis added).

Although Clare's termination notice purports to terminate the 1930 grant under the CTEA (section 304(d)), that statute provides a termination right to only those transfers or licences "executed *before* January 1, 1978[.]" *Id*. (emphasis added). The only pre-1978 grant of rights to SSI, and the only grant to SSI specified in the termination notice, was the 1930 grant made by the author to Slesinger. The 1930 grant, however, was terminated by the beneficiaries of the Pooh Properties Trust upon the execution of the 1983 agreement. Accordingly, there was no pre-1978 grant of rights to SSI in existence when Congress enacted the CTEA in 1998.

The sole grant of rights to SSI, either at the time of the CTEA's enactment or when Clare served her termination notice, was the grant of rights embodied in the 1983 agreement. As the district court correctly explained, however, this grant is not subject to termination under section 304(d)

because it was not "executed before January 1, 1978," as the statute expressly requires. 17 U.S.C. § 304(d).

## 1.   "Agreement to the Contrary"

**[1]** Faced with the reality that she is dealing with a post-1978 agreement, Clare attempts to circumvent the 1983 agreement by claiming that another provision of the CTEA, 17 U.S.C. § 304(c)(5), requires this court to regard the 1983 agreement as an "agreement to the contrary" that does not prevent her from terminating SSI's rights to the Pooh works. Section 304(c)(5) states that a "[t]ermination . . . may be effected notwithstanding any agreement to the contrary, including any agreement to make a will or to make any future grant." 17 U.S.C. § 304(c)(5).

**[2]** The statute does not define the phrase "agreement to the contrary," although it does provide two examples of agreements that would constitute an "agreement to the contrary": "an agreement to make a will" and an agreement "to make any future grant." *Id*. The undisputed fact that the 1983 agreement does not fall into either category supports the district court's finding that the 1983 agreement is not "an agreement to the contrary." *See Sutton v. Providence St. Joseph Med. Ctr*., 192 F.3d 826, 834 (9th Cir. 1999) ("When a statute contains . . . specific items and a general item, we usually deem the general item to be of the same category or class as the more specifically enumerated items.").

To support her theory that the 1983 agreement falls under the category of "an agreement to the contrary," Clare reads the Supreme Court's decision in *Stewart v. Abend*, 495 U.S. 207 (1990), as holding that Congress intended to make the termination right inalienable for authors and their families. *Stewart*, however, did not interpret the "agreement to the contrary" language of section 304(c)(5) or its counterpart under section 203(a)(5).[7] In fact, the only discussion in *Stewart* per-

___

[7]Apart from other differences, the counterpart provision found under section 203 covers transfers effected on or after January 1, 1978, whereas

taining to inalienability is the Court's relatively brief portrayal of the evolution of copyright law, beginning with the Copyright Act of 1790 and ending with the 1976 Copyright Act. *See* 495 U.S. at 230 (noting only that "[t]he 1976 Copyright Act provides a single, fixed term, but provides an inalienable termination right") (citing 17 U.S.C. § 203). Accordingly, *Stewart* does not support the broad "plain meaning" that Clare attributes to section 304(c)(5).

Clare also relies on the Second Circuit's decision in *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002), to support her claim that the 1983 agreement is an "agreement to the contrary" under section 304(c)(5). The contract at issue there was a settlement agreement between the parties, which ended a series of lawsuits filed in the 1960s by the creator of a copyrighted work. *Id.* at 283-84. The creator argued that the settlement agreement should not be given effect because it contractually changed the nature of the copyrighted work, labeling it as a "work made for hire" many years after its creation. *Id.* at 284-85. The effects of this after-the-fact label were to make the creator an "employee for hire" rather than the author of the copyrighted work, and to foreclose his right to terminate the grant he had made in the copyrighted work. *Id.* at 283-84. Thus, unlike the issue presented in the case at bar, the issue facing the Second Circuit was "whether § 304(c)(5)'s phrase 'any agreement to the contrary' includes a settlement agreement stating that a work was created for hire[.]" *Id.* at 290 (quoting 17 U.S.C. § 304(c)(5)).

After examining the legislative history and considering the purpose of section 304(c), the court concluded "that an agreement made subsequent to a work's creation which retroactively deems it a work for hire constitutes an agreement to the contrary under § 304(c)(5) of the 1976 Act." *Id.* at 292 (inter-

section 304(c) covers transfers before that date. 17 U.S.C. §§ 203(a), 304(c).

nal quotation marks omitted). The Second Circuit held that an employer cannot contractually transform a creator or author of a copyrighted work into an "employee for hire." *Id.* The court expressed concern that if it held otherwise, works not satisfying the relationship-based "for hire" test could be coerced by post-facto agreements that designate such works to be something they are not: "works for hire." *Id.* at 291-92.

The facts, reasoning, and holding of *Marvel* have little relevance to this case because, here, there is no after-the-fact attempt to recharacterize the work or a prior agreement. Instead, the 1983 agreement involves contractual provisions that operated prospectively through the revocation of an existing grant and the making of a new one. As the district court recognized, "[t]he parties in the 1983 [a]greement did not attempt to change or modify the nature of their association with one another, or alter the character of their long-standing author/grantee relationship."

Reinforcing this reasoning are the undisputed facts that the 1930 grant was expressly revoked by the Pooh Properties Trust, which made a new grant of rights to SSI that, *inter alia,* was more lucrative for the author's heirs. The fact that the 1983 agreement was meant to protect the continuing viability of the author's grant of rights to SSI is evident from the agreement itself. In that vein, it is important to note that the parties describe their 1983 agreement as a "new agreement *for the future* which the parties believe would not be subject to any right of termination under 17 U.S.C. Secs. 203 or 304(c)" (emphasis added).

Neither *Marvel* nor any other of Clare's cited authority supplies a basis for us to question the district court's decision or to undo the 1983 agreement, which was freely and intelligently entered into by the parties.[8] The beneficiaries of the

---

[8]Also not well taken is Clare's citation of *Rano v. Sipa Press, Inc.,* 987 F.2d 580 (9th Cir. 1993), to support her perspective that section 304(c)

MILNE V. STEPHEN SLESINGER, INC.

MILNE v. STEPHEN SLESINGER, INC.                    16021

Pooh Properties Trust were able to obtain considerably more money as a result of the bargaining power wielded by the author's son, Christopher, who was believed to own a statutory right to terminate the 1930 grant under section 304(c) of the 1976 Copyright Act. Although Christopher presumably could have served a termination notice, he elected instead to use his leverage to obtain a better deal for the Pooh Properties Trust. His daughter, Clare, was a beneficiary of this new arrangement, and her current dissatisfaction provides no reason to discredit the validity of the 1983 agreement and the rights conferred thereby.

## 2.    Legislative History of Section 304(c)

The district court stated there was nothing wrong with the fact that "the 1983 [a]greement was created in order to protect SSI and Disney from a termination of the rights granted to them." Relying on legislative history, the district court read the House Report for the 1976 Copyright Act as confirming the rule that "[n]othing in the Copyright Acts has altered the

preempts any right Christopher had in contracting for the termination of the 1930 grant. Based on *Rano*, she argues that the 1983 agreement did not produce an effective termination because the Pooh Properties Trust did not utilize the statutory termination procedure in place under section 304(c) of the 1976 Copyright Act. This overlooks the fact that *Rano* did not address the effectiveness of a party's purported exercise of a statutory termination right under section 304(c). The *Rano* court only held that the existence of such a statutory termination mechanism in section 203(a)(5) preempts a California common-law rule permitting the unilateral termination at will of an agreement that has a non-specified duration. 987 F.2d at 585-86. Whatever views one may have regarding the correctness of the narrow holding of *Rano*, it cannot be said that *Rano* suggests a ruling that would nullify a mutual decision to revoke a grant of rights. *See Scholastic Entm't, Inc. v. Fox Entm't Group, Inc.*, 336 F.3d 982, 988 n.2 (9th Cir. 2003) (observing that "*Rano* has been called into serious question by courts as well as commentators"). Moreover, *Rano*'s narrow facts have no application here, where the 1930 grant expressly provided for its duration. *See Rano*, 987 F.2d at 583, 585 (emphasizing the fact that the subject agreement was one without a specified duration).

power of private parties to contract." H.R. REP. No. 94-1476, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5743.

Clare criticizes the district court's approach to statutory construction, arguing that section 304(c)'s meaning is clear on its face and that there was no need for the district court to consider legislative history. She maintains that the district court used legislative history to override the statute itself.

**[3]** We disagree. Section 304(c)(5) states that "[t]ermination . . . may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. § 304(c)(5). As we have noted, the phrase "agreement to the contrary" is unclear. Even Clare agrees that the phrase is not defined by the statute, and the Second Circuit has expressly found the phrase ambiguous and that an analysis of legislative history is required to glean its meaning. *Marvel*, 310 F.3d at 290; *accord Walthal v. Rusk*, 172 F.3d 481, 484 (7th Cir. 1999) (reviewing legislative history upon concluding that section 304(c)(5)'s counterpart termination provision under section 203 "is not perfectly clear"). This court has recognized that when a statute's terminology is not clear on its face, it is appropriate to seek guidance in the legislative history. *In re BCE West, L.P.*, 319 F.3d 1166, 1171 (9th Cir. 2003); *see also United States v. Buckland*, 289 F.3d 558, 565 (9th Cir. 2002) ("Where the language is not dispositive, we look to the congressional intent revealed in the history and purposes of the statutory scheme." (internal quotation marks omitted)).

**[4]** As Clare concedes, a review of the legislative history turns up nothing to support her contention that she may terminate SSI's rights in the Pooh works on the theory that the 1983 agreement is an "agreement to the contrary." On the contrary, Congress specifically stated that it did not intend for the statute to "prevent the parties to a transfer or license from voluntarily agreeing at any time to terminate an existing grant

and negotiating a new one[.]" H.R. REP. NO. 94-1476 at 127; 1976 U.S.C.C.A.N. at 5743.[9] Congress further stated that "nothing in this section or legislation is intended to change the existing state of the law of contracts concerning the circumstances in which an author may terminate a license, transfer or assignment." H.R. REP. NO. 94-1476 at 142; 1976 U.S.C.C.A.N. at 5758. Congress therefore anticipated that parties may contract, as an alternative to statutory termination, to revoke a prior grant by replacing it with a new one. Indeed, Congress explicitly endorsed the continued right of "parties to a transfer or license" to "voluntarily agree[ ] at any time to terminate an existing grant and negotiat[e] a new one." H.R. REP. NO. 94-1476 at 127; 1976 U.S.C.C.A.N. at 5743.

The rationale behind the legislation was to "safeguard[ ] authors against unremunerative transfers" and improve the "bargaining position of authors" by giving them a second chance to negotiate more advantageous grants in their works after the works had been sufficiently "exploited" to determine their "value." H.R. REP. NO. 94-1476 at 124; 1976 U.S.C.C.A.N. at 5740. Congress sought to foster this purpose by permitting an author's heirs to use the increased bargaining power conferred by the imminent threat of statutory termination to enter into new, more advantageous grants. This is exactly what Christopher and the other beneficiaries of the Pooh Properties Trust did in 1983.

---

[9]To the extent that the legislative record references section 304(c)(5)'s counterpart provision under section 203(a)(5), we find that history instructive given Congress's use of identical language in both provisions. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (recognizing that " 'identical words used in different parts of the same act are intended to have the same meaning' " under the " 'normal rule of statutory construction' " (quoting *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994))); *see also Batjac Prods., Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223, 1228 (9th Cir. 1998) (supporting the " 'basic canon of statutory construction that identical terms within an Act bear the same meaning' " (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992))).

**[5]** After more than 50 years of advancement of the Pooh works in the marketplace, their value was sufficiently demonstrated, and the 1976 Copyright Act provided Christopher a window for termination. The Pooh Properties Trust recognized the perceived right to terminate as a valuable bargaining chip, and used it to obtain an advantageous agreement that doubled its royalty share relative to SSI's share. Thus, the 1983 agreement exemplifies the increased bargaining power that Congress intended to bestow on authors and their heirs by creating the termination right under the 1976 Copyright Act. As the 1983 agreement appears to be the type expressly contemplated and endorsed by Congress, we do not consider it to be a prohibited "agreement to the contrary" under section 304(c)(5).

In addition, Clare attempts to conjure up a proverbial "parade of horrors" that she believes would result were we to uphold the parties' exercise of free will to enter into the 1983 contract. She argues that judicial recognition of the 1983 agreement " 'would provide a blueprint by which publishers could effectively eliminate an author's termination right' " (quoting *Marvel*, 310 F.3d at 291). The strength of a proposed parade of horrors, however, lies "in direct proportion to (1) the certitude that the provision in question was meant to exclude the very evil represented by the imagined parade, and (2) the probability that the parade will in fact materialize." *Harmelin v. Michigan*, 501 U.S. 957, 986 n.11 (1991) (Scalia, J., concurring). The application of these factors here shows that Clare's imagined parade will never march forward. Clare presents no authority suggesting that Congress designed the statutory termination provisions to prevent parties from agreeing to a simultaneous revocation and new grant of rights. Certainly with regard to the instant case, Clare's concerns are unfounded. The 1983 agreement came about some seven years after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act, and after he was able to assess the works' value over the course of more than five decades. Far from resulting in a termination of

the grantee's rights, the 1983 agreement resulted in an increased royalty stream to the author's heirs — the very result envisioned by Congress when it enacted the termination provisions.

## B.  "Moment of Freedom"

Clare also advances the theory that the 1983 agreement did not serve to revoke the 1930 grant to Slesinger because no "moment of freedom" was built in between the agreement's simultaneous revocation and re-granting of rights in the Pooh works. She claims that section 304(c)(6)(D) requires such a "moment of freedom" before a re-grant of rights may take place, and that without such a moment of freedom, the 1983 agreement is nothing more than an amendment to the original 1930 agreement, one that is terminable under the CTEA.

Section 304(c)(6)(D) reads as follows:

> A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid *only if it is made after the effective date of the termination*. As an exception, however, an agreement for such a further grant may be made between the author . . . and the original grantee or such grantee's successor in title, after the notice of termination has been served. . . .

17 U.S.C. § 304(c)(6)(D) (emphasis added). This provision sets forth the proper timing mechanism for grants and agreements to make grants where the statutory termination under section 304(c)(5) has been exercised. *Id*. But Clare does not contend and cannot contend that in 1983 anyone exercised a *statutory* right of termination with respect to the Pooh works.

Clare's sole support for her position is found in a treatise authored by the late-Professor Melville Nimmer. In his treatise, Professor Nimmer expressed his *assumption* that this

subsection — which on its face applies only to the statutory termination of a prior copyright grant — is intended to benefit authors and should therefore be extended to prohibit a simultaneous contractual termination and re-grant of copyright rights. *See* 3 M. Nimmer, Nimmer on Copyright § 11.07 (6th ed. 1978). Clare's counsel, however, conceded at oral argument that no source of primary authority has endorsed this assumption. We too decline to do so.

**[6]** Congress included the general rule in section 304(c)(6)(D) — prohibiting a new grant of rights terminated by statute until after the effective date of termination — to avoid trafficking in future interests by third parties, which would deprive the original grantee of the opportunity to negotiate a further transfer. H.R. Rep. No. 94-1476 at 127; 1976 U.S.C.C.A.N. at 5743. The exception to this rule provides that once a notice of termination is served, the original grantee or his successor-in-title, here SSI, is the only party to whom the author (or author's heir) may promise a future grant, and is therefore similarly intended to give the original grantee a competitive advantage over third parties (like co-plaintiff Disney) who wish to obtain the rights covered by the terminated grant. *See id.* (stating that the exception is "in the nature of a right of 'first refusal' " in the original grantee's favor). Thus, contrary to Clare's view, section 304(c)(6)(D) was not intended to protect the author or his heirs, but was instead intended to protect licensees, such as SSI.

**[7]** We note that the district court reasonably posited that if Congress intended to require a "moment of freedom," it would have clearly said so. After all, such an implied condition is difficult to harmonize with the statute's purpose of benefitting the original grantee or with other provisions of Title 17. For example, three other statutory provisions require advance notice of termination to be served at least two years before the effective date of the termination. 17 U.S.C. §§ 203(a)(4)(A), 304(c)(4)(A), 304(d)(1).[10] During the two-

---

[10]These provisions themselves intend to benefit the original grantee, as they ensure that the original grantee will have adequate notice of the impending loss of rights.

year period between service of the notice and the termination's effective date, the original grant remains in effect so that the holder of the termination right is no freer to walk away from the to-be-terminated grant than he was before he served the notice. Thus, contrary to the argument advanced by Clare and the Nimmer treatise, section 304(c)(6)(D) does not require a "moment of freedom" between termination of a grant and the creation of a new grant in its place because it allows the author or his heirs to enter into a binding agreement with the original grantee after service of the termination notice but before its effective date.

Even assuming that Congress intended such a "moment of freedom" between a contractual revocation and re-grant of rights, we note that Christopher's ability to exercise his perceived termination right gave him all the freedom he needed to refrain from entering into a new grant of copyright rights to SSI. He parlayed that right into a new agreement giving increased compensation to the Pooh Properties Trust, of which Clare is a prime beneficiary. In doing so, he fulfilled the very purposes for which Congress enacted the termination right. Thus, it defeats common sense to suggest that he needed to take a walk around the block between the time he revoked the old agreement and entered into the new one.

Moreover, still assuming a preference for a moment of freedom, there is nothing to suggest that the parties would have come to any other decision than the one they reached. There is absolutely nothing in the record that would show that the beneficiaries of the Pooh Properties Trust were prejudiced in any way by the 1983 agreement. At bottom, Clare contends that the 1983 agreement did not give her as much money as she would like to receive. Such a position, however, does not amount to a viable termination right under the CTEA.

### III

**[8]** For the foregoing reasons, the district court correctly declared Clare's termination notice ineffective. The CTEA's

termination provision does not apply to post-1978 agreements such as the parties' 1983 agreement, which continues to control the parties' rights and royalty shares in the Pooh works. In addition, Clare is unable to show that the 1983 agreement constitutes an "agreement to the contrary" under section 304(c)(5), and thus the courts cannot disregard the 1983 agreement. Nor are we persuaded by Clare's "moment of freedom" argument. Quite simply, there is no principle of logic, canon of statutory construction, or consideration of fairness that supports Clare's reading of the CTEA. Accordingly, the decision of the district court is **AFFIRMED**.