RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ADELAIDA GARZA, Personal Representative for the Estate of Isaac Donald Everly,

*Plaintiff-Appellee*,

*v.*

PATRICE Y. EVERLY; PHILLIP J. EVERLY; CHRISTOPHER EVERLY; PHILLIP EVERLY FAMILY TRUST; EVERLY AND SONS MUSIC (BMI),

*Defendants-Appellants.*

No. 21-5530

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:17-cv-01440—Aleta Arthur Trauger, District Judge.

Decided and Filed: February 10, 2023

Before: GUY, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Jay S. Bowen, Jacob Clabo, SHACKELFORD BOWEN MCKINLEY & NORTON, LLP, Nashville, Tennessee, for Appellants. Philip M. Kirkpatrick, Joshua Counts Cumby, ADAMS AND REESE LLP, Nashville, Tennessee, for Appellee.

BUSH, J., delivered the opinion of the court in which GUY and MURPHY, JJ., joined. MURPHY, J. (pp. 12–15), delivered a separate concurring opinion.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge. "Phil and Don," once again, are "knocking at the door."[1] *See Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020). The Everly Brothers are a famous musical duo known for many hits. *Cathy's Clown* is the one at issue in this appeal. Older brother Isaac Donald Everly ("Don") and younger brother Philip Everly ("Phil") are now both deceased, but their estates[2] contest authorship over *Cathy's Clown*. Don's estate claims full authorship, while Phil's estate claims co-authorship.

While both brothers may have co-authored the lyrics and tune as a matter of fact, Don's estate alleges that Phil is no longer an author as a matter of copyright law. That is because Don allegedly expressly repudiated Phil's authorship, triggering a three-year window for Phil to re-assert authorship under the Copyright Act. On November 8, 2017, Don sued Phil's estate for a declaratory judgment that Don is sole author of *Cathy's Clown* and should receive the benefits therefrom. The district court granted Don summary judgment, and we reversed because there was a genuine issue of material fact as to whether Don repudiated Phil's authorship. After a bench trial, the district court found that Don did repudiate Phil's authorship and Phil failed to re-assert that he was an author. The district court further determined that because Phil failed to re-assert that he was an author, he was time-barred from asserting he was a co-author as a defense to Don's suit. Phil's estate contests this finding and, in addition, asserts that the three-year statute of limitations applies only to authorship claims, not defenses, and so it should be allowed to argue that Phil was an author to defend against Don's suit. We hold that Don's estate may rely on the statute of limitations here. Because the district court did not clearly err in finding that Phil failed to exercise his rights after Don repudiated his authorship, we AFFIRM.

---

[1] PAUL MCCARTNEY & WINGS, *Let 'Em In*, on WINGS AT THE SPEED OF SOUND (Capitol Records 1976).

[2] The term "estates" is used generally to refer to heirs, statutory successors, and other successors of right to any rights Don or Phil may have had in *Cathy's Clown*.

I.

We briefly recite the history behind this case, as further detail can be found in our earlier opinion, *Everly v. Everly*, 958 F.3d 442, 445–47 (6th Cir. 2020). Although some facts are muddied given the long history of this case, we will rely on the trial court, which conducted a two-day bench trial on April 27 and 28, 2021. *See Everly v. Everly*, 536 F. Supp. 3d 276 (M.D. Tenn. 2021).

The year was 1960. *Cathy's Clown* was recorded, released, and copyrighted—eventually becoming one of the brothers' most famous songs. *Everly*, 958 F.3d at 445. The copyrights listed Phil and Don as authors, and both brothers were credited as co-authors and received royalties. Although the brothers shared credit for many years, over time, their relationship soured. Don, around 1980, began pressuring Phil to take his name off the song.[3] The district court believed Don's testimony that he sent Phil a letter saying "you can give me my songs back," which referred to *Cathy's Clown* and other songs. It also concluded based on witness testimony that Don placed a telephone call to Phil, during which Phil appears to have implied he was a co-author, but nonetheless allowed Don to take full authorship. On June 10 and 11, 1980, Phil signed five documents titled "Release and Assignment," all notarized, related to *Cathy's Clown* and sixteen other works. The release related to *Cathy's Clown* states, "Phil Everly desires to release, and transfer, to the said Don Everly all of his rights, interests and claim in and to ['Cathy's Clown'], including rights to royalties *and his claim as co-composer*, effective June 1, 1980." Memorandum Opinion, R.103, at 15 (citation omitted) (emphasis added by district court).

The district court viewed this release as a signal that Phil acquiesced to Don's repudiation of Phil's authorship. Further, an email introduced at trial from Lewis Anderson, owner of a company that helps songwriters such as Phil recapture copyright ownership, indicates Phil acknowledged he made "an agreement with Don to remove himself as writer of 'Cathy's Clown.'" The district court recognized some contradictory evidence of Phil's factual authorship, particularly a 1984 television interview (which postdates the 1980 release) during which Don

---

[3]Don claimed in this litigation that he had described *Cathy's Clown* as authored by both Everly brothers to maintain the image that they wrote their songs together.

explains the creation of *Cathy's Clown*: "I started a song, called Phil over, he came over and we worked—we hashed it out, and went into the studio." Memorandum Opinion, R.103, at 19–20. But the district court determined that "worked" and "hashed it out" did not establish Phil's contributions to writing lyrics or composition. In fact, Don asserted vehemently at trial that he alone wrote the entire song *Cathy's Clown*, testimony which the district court found "very credible."

All in all, the district court found that, according to a preponderance of the evidence, "Don plainly and expressly repudiated Phil's authorship" of *Cathy's Clown* by letter and telephone call in 1980, culminating in the 1980 "Release and Assignment." This express repudiation triggered a three-year window for Phil to make an authorship claim under the Copyright Act—which Phil undisputedly failed to do.

The district court also rejected Phil's estate's argument that the three-year statute of limitations should not apply to the defense that Phil is co-author. While it is true that statutes of limitations do not usually apply to defenses, the district court viewed Phil's authorship claim as "amount[ing] to" an affirmative claim. *Id.* at 22. It viewed Phil's estate as "skirting" the statute of limitations by bringing a claim in the form of a defense. *Id.* at 25. Further, the district court noted that it was Phil's estate which "sought to topple the status quo" by attempting to terminate the 1980 release. *Id.* at 27. Because Phil's authorship claim was time-barred, the district court entered judgment for Don's estate. *Id.* at 29–30.

## II.

On appeal from a judgment entered after a bench trial, "we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *Kehoe Component Sales Inc. v. Best Lighting Prods.*, 796 F.3d 576, 585 (6th Cir. 2015) (quoting *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 547 (6th Cir. 2010)). Phil's estate raises three general arguments on appeal: (1) it contests the district court's application of certain aspects of the Copyright Act's scheme for handling authorship claims; (2) it argues the district court's finding of express repudiation was error; and (3) it disagrees with the district court's holding that the statute of limitations of three years for a copyright claim bars an authorship "defense." We consider these arguments in turn.

III.

A copyright initially vests in the author or authors of a work. 17 U.S.C. § 201(a). Authors can transfer ownership of a copyright to, say, a publisher, which would grant said publisher exclusive rights to reproduce and distribute the work. *Everly*, 958 F.3d at 449. Authors, even if they transfer ownership, retain some rights, including a termination right, which allows authors to regain copyright ownership down the line. *Id.* at 449–450. Termination rights cannot be transferred. *Id.* at 450.

A person must bring a claim under the Copyright Act "within three years after the claim accrued." 17 U.S.C. § 507(b). This three-year statute of limitations begins to run between co-authors when "there is a 'plain and express repudiation' . . . by one party as against the other." *Everly*, 958 F.3d at 450 (quoting *Ritchie v. Williams*, 395 F.3d 283, 288 n.5 (6th Cir. 2005)). Such a claim "accrues only once," at the time of repudiation. *Id.* at 450 (quoting *Roger Miller Music v. Sony/ATV Publ'g*, 477 F.3d 383, 390 (6th Cir. 2007)). Repudiation must come from someone claiming authorship, not a third party. *Id.* at 453. "Allowing authors to sleep on their rights even after they have been repudiated would inject instability into an area of copyright law that calls out for certainty." *Id.*

Phil's estate makes two arguments to avoid application of this scheme. First, it asserts that because termination rights are inalienable, the district court's holding that Phil is not a co-author violates the Copyright Act by alienating his termination rights. Citing Nimmer, Phil's estate notes that "authors and their successors may terminate copyright assignments in spite of any contractual device that purports to divest them of the right." 3 Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT § 11.07. Therefore, the district court created a "work-around" to allow divestiture of termination rights.

We disagree. The district court nowhere held that authors can divest their copyright termination rights by contract. Rather, the statute of limitations plainly bars claims three years after they accrue, so adhering to that language gives effect to the statutory framework, rather than nullifying it. Authors who fail to bring a timely authorship claim no longer have termination rights to alienate.

Phil's estate also argues that the statute of limitations should start running only after a formal termination notice is sent, which is when it believes Phil's authorship claims first had to be asserted. But under our case law, the trigger for starting the clock on raising an authorship claim is a plain and express repudiation, *Ritchie*, 395 F.3d at 288 n.5, which can occur even if there is no formal termination notice. Indeed, we have noted repudiation is akin to adverse possession, *Everly*, 958 F.3d at 451; a landowner need not be served with a document for the adverse possession clock to run.

Nor are we sympathetic that some members of Phil's estate, including descendants of Phil, are "newfound claimants." Phil's descendants cannot inherit authorship rights beyond what Phil himself possessed. Put another way, the statute of limitations does not refresh itself simply because Phil passed away and his descendants want to bring a belated authorship claim.

With those issues resolved, we now turn to the statutory scheme for authorship disputes.

IV.

We examine two issues: (1) whether the district court clearly erred in finding that Don repudiated Phil's authorship and Phil did not object to that repudiation within three years, and (2) whether Don's estate may rely on the three-year statute of limitations to bar Phil's estate's assertion of co-authorship.

A.    The Repudiation

The key question is whether the district court committed clear error in finding that Don repudiated Phil's authorship around the year 1980. It is undisputed Phil did not bring a timely claim to maintain co-author status after this time. Therefore, if Don repudiated Phil's authorship, Phil's estate is barred from bringing an *affirmative* authorship claim. We hold that the district court did not clearly err in finding that Don repudiated Phil's authorship.

It is undisputed that in 1980, Phil signed five notarized documents titled "Release and Assignment" that relinquished "his claim as co-composer." Memorandum Opinion, R.103, at 14–15. Further, the district court found that Don, by letter and telephone call, told Phil that Don was sole author and demanded Phil "take his name off" *Cathy's Clown*. *Id.* at 14. Terri Brown,

a witness with ties to the entertainment industry and a close friend of Phil's, testified that Phil told her he had "given up his share of writing" in *Cathy's Clown*. *Id.* at 13. Joey Paige, former bass player for the Everly Brothers and close friend of Phil's, testified that he was present when Phil received the phone call from Don and that Phil said he would give the song back to Don. *Id.* at 12. The district court noted, too, that after these events in 1980, credit for the song accrued to Don only, and Phil treated the song as Don's. In fact, Phil made efforts to terminate copyright grants for other lucrative songs, but not for *Cathy's Clown*. Phil told Lewis Anderson, owner of a company that helps songwriters recapture copyright ownership, that he had "made an agreement with Don to remove himself as writer of 'Cathy's Clown.'" *Id.* at 16–17. A termination notice was filed for *Cathy's Clown* only by Phil's descendants and only after his passing.

The district court also considered contrary evidence, including the testimony of Patti Everly, who was married to Phil until his death. She testified to the effect that Phil had recently been contemplating recapturing the copyright and that termination notices may have been written but not done correctly. The district court did not find this testimony credible given other evidence in the record and the fact that Phil had successfully filed termination notices for nineteen songs through the same person allegedly charged with terminating the rights of *Cathy's Clown*. Lewis Anderson could not find any evidence of a notice of termination for *Cathy's Clown*. And although Phil's estate portrays Don as a "bully" and points to Phil's distress surrounding losing the rights to *Cathy's Clown*, Phil may have had legitimate reasons for giving up authorship, including keeping family peace and making up for Don's generosity in crediting Phil for other songs of which Phil was not an author.

Altogether, the district court found, "by a preponderance of the evidence, that Don plainly and expressly repudiated Phil's authorship of 'Cathy's Clown' by letter and then by telephone call in 1980 and that the 1980 Release was intended to be a memorialization of that repudiation." *Id.* at 21. That finding is not clearly erroneous. Therefore, Phil's estate is barred from bringing an affirmative co-authorship claim.

B.    Applicability of Statutes of Limitations to Defenses

Even if Phil's estate is barred from raising an affirmative co-authorship claim, may it raise co-authorship as a defense?  It originally raised authorship as a counterclaim, not a defense. Don then raised the statute of limitations as an affirmative defense to the counterclaim.  In a motion for reconsideration before the district court, Phil's estate essentially reframed the counterclaim into a defense, making the argument that the statute of limitations could not be used as a "sword" against the defense of co-authorship.  *Everly*, 958 F.3d at 448.  The first time this case reached our court, we did not reach this issue because it had not been argued until the motion-for-reconsideration stage.  *Id.* at 449.  However, the district court reached this issue on remand, and the issue is fully briefed.  Further, this defense has the same content as the original counterclaim—that Phil is co-author—and therefore allowing it to be raised would not result in unfair surprise.  *See Rogers v. IRS*, 822 F.3d 854, 856 (6th Cir. 2016) (quoting *Lauderdale v. Wells Fargo Home Mortg.*, 552 F. App'x 566, 573 (6th Cir. 2014)) (allowing defense to be raised late if it does not surprise or prejudice the plaintiff).  We therefore address it now.

A principal justification for statutes of limitations is to prevent surprises from the revival of dormant claims after witnesses have passed and evidence has been lost.  *Ord. of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348–49 (1944); *see also United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 72 (1956) ("The purpose of such statutes is to keep stale litigation out of the courts.").  Many other justifications for statutes of limitations have been proffered. *See* Tyler T. Ochoa & Andrew Wistrich, *The Puzzling Purposes of Statutes of Limitation*, 28 PAC. L.J. 453, 453 (1997) (*e.g.*, reducing litigation, promoting diligence, and avoiding retrospective application of new standards).  The federal limitations period for copyright claims serves two special purposes: (1) to render uniform and certain the time frame for copyright claims and (2) to prevent forum shopping resulting from disuniform state limitations periods. *Petrella v. MGM*, 572 U.S. 663, 670 (2014).

Generally, however, statutes of limitations do not apply to defenses.  *See W. Pac. R.R.*, 352 U.S. at 72; *Est. of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163–64 (2d Cir. 2003) (quoting *Luckenbach S.S. Co. v. United States*, 312 F.2d 545, 548–51, 552 n.3 (2d Cir. 1963)) ("The law is well settled that limitations do not normally run against a defense.").  That is,

at least in part, because the ability to raise a defense is not expected to stir up litigation about old issues. *See W. Pac. R.R.*, 352 U.S. at 72. In addition, if defenses could expire, a potential plaintiff could wait until defenses are time barred and then "pounce" on the defendant. *City of St. Paul v. Evans*, 344 F.3d 1029, 1034 (9th Cir. 2003).

In this vein, Phil's estate relies on *Estate of Hogarth*, in which the Second Circuit held that a defendant could raise a work-for-hire defense in the copyright context even if it would be barred as a claim. 342 F.3d at 163. The court reasoned, "A defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations. . . . Potential defendants are not required to seek at the earliest opportunity a declaration that a defense to a claim not yet brought is valid." *Id.* at 163–64 (citations omitted). However, it is important that a defendant only seek to defend himself, rather than use a defense as a work-around to bring a time-barred claim. *See Evans*, 344 F.3d at 1034–35 ("It is important that the party asserting the defense is not, simultaneously or in parallel litigation, seeking affirmative recovery on an identical claim. Thus, whether affirmative defenses are exempt from statutes of limitations largely hinges on a realistic assessment of the parties' litigation posture.").

In *Evans*, a plaintiff city sought to void a settlement after the statute of limitations had passed on its claims. *Id.* at 1033. The district court allowed identical affirmative defenses to be raised in response to counterclaims. *Id.* On appeal, the Ninth Circuit reversed, emphasizing the importance of "a realistic assessment of the parties' litigation posture." *Id.* at 1035. A party who, in raising a defense, is "seeking affirmative recovery" or using "subterfuge to characterize a claim as a defense in order to avoid a temporal bar," *id.* (citing *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1488 (Temp. Emer. Ct. App. 1983)), is an "aggressor" and thus is not merely defending itself, *id.* To hold otherwise, the court explained, would allow "jurisdictional jujitsu" to be used to "evade" a statute of limitations. *Id.* at 1031. We agree with the Ninth Circuit's analysis and adopt this rule for the limited situation where a defendant is seeking affirmative relief packaged within a defense and is attempting to dodge a statute of limitations that is an important part of the statutory framework.

Is Phil's estate seeking affirmative relief or merely trying to defend itself? It originally raised co-authorship as a counterclaim. It sought a declaratory judgment that Phil is co-author

and entitled to "one-half of the income earned from the exploitation of the Composition." Answer, Affirmative Defenses and Counterclaim, R.5, PageID 71. Ultimately, then, the estate is asserting authorship and the financial benefits thereof.

It is hard to see how Phil's estate is not seeking affirmative relief. As we have held, it would not be able to bring suit over authorship as an affirmative claim. Yet it attempts to bring the exact same claim as a defense to assert that Phil was co-author. We do not adopt a formalistic approach that would allow Phil's estate to relabel its assertions as a defense in order to employ a "jurisdictional jujitsu" to evade a statute of limitations. *See Evans*, 344 F.3d at 1031. Here, the statutory scheme is intended to create certainty after three years, and the estate may not avoid that outcome at this late stage.

We do not hold, however, that Phil's estate may never raise Phil's authorship as a defense. For example, if Don's estate were seeking damages for infringement, for defamation, or the like, Phil's estate perhaps could rely on Phil's factual authorship of *Cathy's Clown*, if proved, to reduce its liability to the extent authorship is relevant. But here, Phil's estate attempts to use a defense to secure the benefits of authorship—despite its authorship claims being barred. *See Est. of Hogarth*, 342 F.3d at 163 (quoting *W. Pac. R.R.*, 352 U.S. at 72) ("A defendant who is *not seeking any affirmative relief* and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations.") (emphasis added). Therefore, Phil's authorship can conceivably be used as a defense in other contexts, but not in a legal contest over who owns the rights to and profits from *Cathy's Clown*—an issue that was settled by Don's repudiation long ago.

Phil's estate also disputes the district court's finding that it was the party who "sought to topple the status quo." Appellants' Br. at 37 (quoting Memorandum Opinion, R.103, at 27). We agree it is not necessarily clear that it is Phil's estate that attempted to disrupt the status quo. In 2011, Don filed termination notices to recapture the full rights and ownership of *Cathy's Clown*. Letter to Jay Bowen, R. 41-1, PageID 900–01. Therefore, if Phil factually co-authored *Cathy's Clown*, Don arguably intruded on that situation by attempting to recapture full rights and ownership. But this point is moot because Phil's estate is seeking affirmative relief that is barred by the statutory framework.

Therefore, we conclude Phil's estate is barred from claiming authorship as a defense in this context.

V.

In sum, we hold that the district court did not clearly err in finding that Don repudiated Phil's authorship of the song *Cathy's Clown* and that Phil did not respond to the repudiation by asserting his authorship rights within the applicable statute-of-limitations period.  Therefore, Phil Everly's heirs and successors are barred from claiming or exercising rights related to authorship of the song *Cathy's Clown*.  We **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring. The majority opinion cogently explains why we must affirm the district court's fact-bound conclusion that Don Everly plainly and expressly repudiated Phil Everly's co-authorship of *Cathy's Clown* in 1980. Because our cases treat a person's status as a copyright author or owner as a "claim," the district court's conclusion of a plain and express repudiation means that the Copyright Act's three-year statute of limitations has run on the "claim" by Phil's estate that Phil co-authored *Cathy's Clown*. *See Everly v. Everly*, 958 F.3d 442, 450–55 (6th Cir. 2020). I write to reaffirm my "doubt over whether our [plain-and-express-repudiation] test is the right way to think about the start date for this statute of limitations." *Id.* at 460 (Murphy, J., concurring).

To summarize, our test has two problems. The statute's text adopts an *occurrence rule* that starts the limitations period on the date that the claim "accrued"—that is, the date that the claim came into existence (whether or not a plaintiff knows of it). 17 U.S.C. § 507(b). But our test follows a *discovery rule* that starts the limitations period on the date that a plaintiff should have known that another author has repudiated the plaintiff's authorship interest. *See Everly*, 958 F.3d at 460–63 (Murphy, J., concurring). Next, the statute's text starts the limitations period not just when anything accrues but when a *claim* accrues—that is, when the plaintiff has a completed cause of action for relief whose elements have all been met. 17 U.S.C. § 507(b); *see Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014). Our test treats a party's authorship or ownership as a "claim" even though it is merely one element of a claim for copyright infringement (between a copyright owner and a third-party infringer) or an equitable distribution of royalties (between co-owners). *See Everly*, 958 F.3d at 463–68 (Murphy, J., concurring).

In my mind, the new question in this second appeal (Does the Copyright Act's statute of limitations apply to a party's "defense"?) further illuminates the oddity of our approach. To answer this question, start with the text: "No civil action shall be maintained under the

provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  This language says nothing about barring a defendant's "defense"; it covers a plaintiff's "claim."  The answer to the question whether the statute applies to a defense thus is an unambiguous "no."   As the majority opinion notes, if a plaintiff sought damages from a defendant for copyright infringement under 17 U.S.C. § 501(b), the defendant could assert a co-ownership defense because co-owners cannot sue each other for infringement under our precedent.  *See Severe Records, LLC v. Rich*, 658 F.3d 571, 582 (6th Cir. 2011).  So Phil might at first appear to have the better of the argument when he says that he may raise his co-authorship status as a "defense" to Don's suit.

Yet Don's suit adds a complexity that we must account for.  He did not sue Phil's estate for royalties under an equitable "accounting" cause of action.  *See Everly*, 958 F.3d at 467 (Murphy, J., concurring).  Rather, he sued Phil's estate for a declaration of rights under the Declaratory Judgment Act.  Compl., R.1, PageID 1.  Don asked the court to "declare" that he was entitled to 100% of the royalties from *Cathy's Clown* and that the estate was entitled to none.  *Id.*, PageID 2, 12–13.  I read the copyright statute of limitations as using the word "claim" as a term of art to refer to the "direct claim" that would arise between the parties outside the declaratory-judgment context.  *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997).  As I said before, "a declaration is a remedy, not a claim, and its main benefit is to allow parties to learn their rights 'before a claim has accrued.'" *Everly*, 958 F.3d at 466 (Murphy, J., concurring) (quoting Restatement (Second) of Judgments § 33 cmt. a).

So how would a "claim" between Don and Phil's estate arise if the Declaratory Judgment Act did not exist?  Most likely, Phil's estate would pursue relief against Don for Phil's share of the royalties under the "accounting" cause of action that I mentioned.  The estate would assert that Phil qualified as a "co-author" under the copyright laws and so was entitled to half of the royalties.  *See Everly*, 958 F.3d at 467 (Murphy, J., concurring).  Assuming that the federal statute of limitations would apply to this state-law claim because it turned on a federal question, *cf. id.*, Phil's estate would assert the "direct claim" against Don, *Int'l Ass'n of Machinists*, 108 F.3d at 668.  And Don could invoke the statute of limitations in his defense.  That is

essentially what Don sought to do with this preemptive declaratory-judgment suit. Suppose that Don's complaint expressly asked for a declaration that the three-year statute of limitations had run on the claim by Phil's estate that Phil was a co-author. It would make no sense to say that Phil's estate could raise this co-authorship claim as a defense to Don's preemptive statute-of-limitations defense against that very claim. Two parties to a lawsuit cannot both be raising "defenses."

This idea that we must look to how the "claim" would arise outside the declaratory-judgment context is nothing new. An analogy to federal-question jurisdiction proves the point. *See* 28 U.S.C. § 1331. Under the "well-pleaded complaint" rule, a suit arises under federal law within the meaning of § 1331 only if the plaintiff's suit is based on federal law, not if the defendant has a federal-law defense to a state-law suit. *See Vaden v. Discover Bank*, 556 U.S. 49, 59–60 (2009). But suppose the hypothetical defendant preemptively seeks a declaratory judgment that its federal defense invalidates the state-law claim. Does the suit arise under federal law because the declaratory-judgment complaint seeks federal relief on its face? No. We must look to the hypothetical claim for coercive relief by the future plaintiff (and current declaratory-judgment defendant) to determine our jurisdiction. *See Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 16–19 (1983); *AmSouth Bank v. Dale*, 386 F.3d 763, 775 (6th Cir. 2004). I would interpret the word "claim" in the copyright statute of limitations to follow the same approach.

That brings me to the oddity of our current framework, which applies different rules to claims between co-authors than those that apply to claims between an author and a third-party infringer. Among other issues, the parties here dispute the validity of the purported termination by Phil's estate of a license that Phil and Don granted to Acuff-Rose in 1960. Compl., R.1, PageID 5–11. The court rightly holds that, under our plain-and-express-repudiation test, the statute of limitations bars the "claim" by Phil's estate that Phil qualifies as a co-author in the suit with Don. That is because we would treat the estate's declaratory-judgment suit seeking a declaration of co-authorship status as a "direct claim" for coercive relief. *Int'l Ass'n of Machinists*, 108 F.3d at 668.

But what if Phil's estate had also asserted a crossclaim against Sony/ATV (the successor to Acuff-Rose) seeking a declaration that Sony/ATV would infringe Phil's copyright if it continued to publish *Cathy's Clown* because the estate validly terminated the license? *Cf. Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1041 (9th Cir. 2005). Phil's estate would have to prove his co-authorship (technically, his co-ownership through that co-authorship) as an element of this infringement claim. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). But the statute of limitations would not stand in the way of the estate's attempt to do so because the claim would not accrue until Sony/ATV's potential act of infringement. *See Petrella*, 572 U.S. at 670–71. And if Phil proved his co-authorship in this crossclaim, I would have no idea where the future royalties should go. Don would have won a declaration that the statute-of-limitations had run on the "authorship" claim by Phil's estate against Don, but Phil's estate would have won a declaration that Sony/ATV would infringe his copyright rights as a co-author.

In short, the claims among co-authors and infringers relate to each other and should follow the same accrual rules. But we and other circuit courts treat them differently. Although I remain dubious of that approach, I concur in the majority's opinion because it represents current law.