**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLASSIC MEDIA, INC.,
      *Plaintiff-counter-defendant-*
             *Appellee,*

    v.

WINIFRED KNIGHT MEWBORN,
      *Defendant-counter-claimant-*
             *Appellant.*

No. 06-55385

D.C. No.
CV-05-00452-RGK

CLASSIC MEDIA, INC.,
      *Plaintiff-counter-defendant-*
             *Appellant,*

    v.

WINIFRED KNIGHT MEWBORN,
      *Defendant-counter-claimant-*
             *Appellee.*

No. 06-55704

D.C. No.
CV-05-00452-RGK

OPINION

Appeals from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
October 15, 2007—Pasadena, California

Filed July 11, 2008

Before: Ferdinand F. Fernandez and Kim McLane Wardlaw, Circuit Judges, and Raner C. Collins,* District Judge.

Opinion by Judge Wardlaw

---

*The Honorable Raner C. Collins, United States District Judge for the District of Arizona, sitting by designation.

**COUNSEL**

Marc Toberoff (argued), Nicholas C. Williamson, Law Offices of Marc Toberoff, PLC, Los Angeles, California, for the plaintiff/counterclaimant/defendant-appellant.

Bonnie E. Eskenazi, Aaron J. Moss (argued), Greenberg Glusker Fields Claman & Machtinger LLP, Los Angeles, California, for the defendant/counterclaimant-appellee.

**OPINION**

WARDLAW, Circuit Judge:

Winifred Knight Mewborn ("Mewborn"), daughter of Eric Knight, the author of the world-famous children's story and novel, *Lassie Come Home* (collectively, the "Lassie Works"), appeals the district court's grant of summary judgment in favor of Classic Media, Inc. ("Classic") and denial of Mewborn's partial summary judgment motion. Each party sought declaratory relief as to their respective copyright interests in the Lassie Works, works that were in their renewal copyright terms on January 1, 1978 when the Copyright Act of 1976 (the "Act" or the "1976 Act") took effect. This appeal requires us to determine whether the Act's termination of transfer right, 17 U.S.C. § 304(c), can be extinguished by a post-1978 re-grant of the very rights previously assigned before 1978. Because we conclude that such a result would

circumvent the plain statutory language of the 1976 Act, as
well as the congressional intent to give the benefit of the addi-
tional renewal term to the author and his heirs, we hold that
the post-1978 assignment did not extinguish Mewborn's stat-
utory termination rights.

## I.   Factual and Procedural Background

Eric Knight authored the beloved children's story, "Lassie
Come Home," about a boy and his dog who, when sold to a
rich duke by the boy's poverty-stricken family, makes an
arduous journey to return home to her original owner.
Inspired by the harsh realities of life during the Great Depres-
sion, the story of the fearless collie, Lassie, and the boy who
loved her was first published in the December 17, 1938 issue
of *The Saturday Evening Post*, and was registered in the U.S.
Copyright Office that year. Knight later developed the story
into a novel, which was published and registered in the U.S.
Copyright Office in 1940. Knight granted the rights to make
the popular *Lassie* television series to Classic's predecessors-
in-interest, but died in 1943, before the renewal rights had
vested. Under section 24 of the 1909 Copyright Act, the inter-
est in the renewal term of the copyrights reverted to Knight's
wife, Ruth, and their three daughters, Jennie Knight Moore,
Betty Knight Myers and Winifred Knight Mewborn. Each
heir timely filed a renewal of copyright with the U.S. Copy-
right Office in each of the works between 1965 and 1967.
Because Classic's predecessors-in-interest had an agreement
only with Knight's widow as to the television series, it
became necessary to secure agreements from the three daugh-
ters for the renewal term of motion picture, television and
radio rights. Thus, Lassie Television, Inc. ("LTI") approached
Mewborn and her sisters, Moore and Myers, to obtain the nec-
essary rights.

In a written agreement dated July 14, 1976, Mewborn
assigned her 25 percent share of the motion picture, television

and radio rights in the Lassie Works to LTI for $11,000 ("1976 Assignment"). The contract states, in relevant part:

> I, Winifred Knight Mewborn, . . . hereby sell, grant, and assign to [LTI] all of the following rights in and to the story entitled LASSIE COME-HOME written by Eric Knight and published in the Saturday Evening Post on December 17, 1938 and the novel or book based thereon also written by Eric Knight and published by John C. Winston Co. in 1940 . . . :

> All motion picture (including musical motion picture), television and radio rights in and to the said literary work[s] . . . throughout the world for the full period of the renewal copyrights in the work[s] and any further renewals or extensions thereof.

It was not until March 1978 that LTI was able to obtain similar assignments from Mewborn's two sisters. On March 17, 1978 and March 22, 1978, Myers and Moore, respectively, assigned their motion picture, television and radio rights to LTI, as well as ancillary rights such as merchandising, dramatic, recording and certain publishing rights. They each received $3,000 in exchange. To conform the grant of rights among the sisters, on March 16, 1978, Mewborn signed a second agreement, furnished by LTI ("1978 Assignment"). The assignment reads:

> I, Winifred Knight Mewborn, . . . hereby grant, assign and set over unto [LTI] and its successors and assigns forever, all the following rights in and to the literary work entitled "LASSIE COME-HOME" . . . (a) [a]ll motion picture (including musical motion picture) rights, television rights, radio rights, recording rights, and dramatic rights on the legitimate stage . . . and all merchandising, commercial tie-up and related rights, and certain publication rights . . . .

The 1978 Assignment contained the identical transfer of motion picture, television and radio rights as the 1976 Assignment, but added language assigning ancillary rights to LTI, including recording and dramatic rights, all merchandising, commercial tie-up and related rights and certain publication rights, as well as language stating:

> [a]ll of the foregoing rights are granted to [LTI] throughout the world in perpetuity, *to the extent such rights are owned by me*, as hereinafter provided. . . . The rights granted herein to [LTI] are *in addition to* the rights granted by me to [LTI] under and pursuant to an assignment dated July 14, 1976, recorded with the United States Copyright Office on July 12, 1976 in Volume 1589 at Pages 258-259 . . . .

(emphasis added). In exchange, LTI also paid Mewborn $3,000. Apart from references to the 1976 Assignment, which only Mewborn had entered into, the three sisters' 1978 assignments were identical.

On April 12, 1996, Mewborn served a notice of termination ("Termination Notice") within the five-year period required by § 304(c) on Palladium Limited Partnership ("Palladium"), LTI's then successor-in-interest in the Lassie Works. Mewborn sought to recapture her motion picture, television and radio rights by terminating the 1976 Assignment effective May 1, 1998. This began the Lassie Works' difficult journey home, as counsel on behalf of the parties—but predominantly Classic—spewed acrimonious charges, threats and demands over the rights to the works in a series of correspondence of not much relevance, but nonetheless included in the record before us. On April 1, 1998, counsel for LTI's then successor-in-interest, Golden Books Family Entertainment, wrote to Mewborn, "rejecting and repudiating" Mewborn's Termination Notice, and threatening suit against Mewborn. Mewborn discovered in the autumn of 2004 that Classic was preparing to produce a motion picture entitled *Lassie Come Home*,

based on her father's works. On March 23, 2005, Mewborn's counsel wrote to Classic, the subsequent successor-in-interest to the Lassie Works, and its production partners demanding that Classic account for and pay to Mewborn her share of profits from Classic's exploitation of the Lassie motion picture, television and radio rights pursuant to the 1996 Termination Notice, and that Classic cease the unauthorized exploitation of the works in the United Kingdom. Classic's counsel responded with a vituperative gem of a letter dated March 29, 2005, accusing Mewborn of "extortion," threatening to sue Mewborn and her counsel "personally," and claiming that "[t]he damages to which Classic will hold you accountable are enormous . . . [and] irreparable." The letter asserted that the 1976 Assignment was a "complete irrelevancy" and advised that Mewborn should "govern [herself] accordingly." This bombastic correspondence did little to further communication or deter litigation.

As a result, on May 27, 2005, Classic filed a declaratory relief action in the Central District of California against Mewborn seeking a declaration that Mewborn has no interest in the Lassie film or in any of the rights she previously assigned to LTI in the 1978 Assignment, and that Mewborn's Termination Notice was ineffective. On June 29, 2005, Mewborn counterclaimed seeking a declaration that, in fact, Mewborn had recaptured some of her previously assigned rights, and requesting an accounting of Classic's profits as of May 1, 1998, the effective termination date under the Termination Notice.[1]

The parties filed cross-motions for summary judgment. On February 9, 2006, the district court granted Classic's motion for summary judgment and denied Mewborn's motion as moot. Interpreting the § 304(c) termination right to be inalien-

---

[1]Mewborn also included a claim alleging violation of the Lanham Act. The district court dismissed the Lanham Act claim with prejudice on September 28, 2005, and the dismissal of that claim has not been appealed.

able but subject to waiver or relinquishment, the district court found that the parties intended that the 1978 Assignment "give away" all of Mewborn's additional rights not transferred in 1976, which included her newly acquired § 304(c) right to terminate the 1976 Assignment. Accordingly, Mewborn had relinquished her termination right, and the 1996 Notice of Termination was ineffective because Mewborn no longer had any interest in the rights transferred in 1976 and 1978. The district court also found that the 1978 Assignment did not substitute for or revoke the 1976 Assignment and that the 1976 Assignment remained intact.

After final judgment was entered, Classic moved for attorneys' fees. On April 13, 2006, the district court denied Classic's motion, concluding that Classic is not entitled to fees under either the Copyright or Lanham Acts. With respect to the claim for attorneys' fees under the Copyright Act, the district court found that, although Mewborn was unsuccessful, her claim presented a close question in an unsettled area of the law and was not objectively unreasonable or improperly motivated, and an award of fees would not advance the dual goals of compensation and deterrence. Similarly, the district court concluded that the Lanham Act claim was not groundless or unreasonable.

## II.    Standards of Review

We review a district court's decision on cross motions for summary judgment de novo. *Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 816 (9th Cir. 2007) (citing *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002)). We review a district court's decision whether to award attorneys' fees under the Copyright Act for an abuse of discretion. *See Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003). We similarly review the decision whether to award fees under the Lanham Act for an abuse of discretion. *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003). Whether the circumstances are "exceptional"—a prerequisite

to an attorneys' fees award pursuant to the Lanham Act—is a question of law that is reviewed de novo. *Id.*

## III.  Discussion

Despite (1) the express statutory language that termination of a pre-1978 transfer "may be effected notwithstanding any agreement to the contrary," 17 U.S.C. § 304(c)(5); (2) Congress's clear intent to benefit authors and their heirs with additional years of copyright protection in the 1976 Act, as recognized by the Supreme Court; and (3) the omission of any language transferring termination rights in the 1978 Assignment or even a mention of the right of termination, the district court concluded that Mewborn intended to relinquish and impliedly waived her "newly acquired right of termination" when she executed the 1978 Assignment. The district court reasoned that by virtue of the 1976 Assignment, "Mewborn had already transferred her interest in all motion picture, television and radio rights" and that "the only reasonable interpretation of the 1978 contract language is that she intended to give away any additional motion picture, television and radio rights not given away in 1976, thus relinquishing her newly acquired right of termination." We disagree.

**[1]** On October 19, 1976—between the dates that Mewborn executed the two assignments—Congress enacted the 1976 Copyright Act, which took effect on January 1, 1978. The Act extended the length of copyright protection for copyrights in existence on January 1, 1978 by 19 years, from 56 years to 75 years (the "Extended Renewal Term"). *See* 17 U.S.C. § 304(a). The Act also created a right of termination, under § 304(c), which allows an author, if he is living, or his widow and children, if he is not, to recapture, for the Extended Renewal Term, the rights that had previously been transferred to third parties. The rights thus revert to the author or his statutory heirs. The termination of transfer right, as applied to the widow and children, is limited to transfers executed before January 1, 1978. *See id.* § 304(c). The termination of transfer

may be effected only during a five year window beginning at the end of what would have been the copyright's original and renewal terms (the end of 56 years from the date the copyright was originally secured), or beginning on January 1, 1978, whichever is later. *Id.* § 304(c)(3). Thus, the five-year termination window for the Lassie copyrights opened in 1994 for the 1938 story, and 1996 for the 1940 novel.

**[2]** Under § 304(c)(4)(A), advance notice of termination must be served not less than two or more than ten years before the effective termination date. Most significantly, under § 304(c)(5), "[t]ermination of the grant may be effected *notwithstanding any agreement to the contrar*y, including an agreement to make a will or to make any future grant." (emphasis added). Under 17 U.S.C. § 101, the term "including" is "illustrative" not "limitative" and thus we must interpret the term "agreement[s] to the contrary" under § 304(c)(5) as inclusive of agreements other than the two examples Congress explicitly mentioned.[2]

Congress enacted the inalienability of termination rights provision in § 304(c)(5) to resurrect the fundamental purpose underlying the two-tiered structure of the duration of copyrights it originally adopted: to award to the author, and not to the assignee of the right to exploit the copyright during its initial term, the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success. As reported in the House Report for the 1909 Act :

---

[2]In *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1043 (9th Cir. 2005), we accorded some evidentiary weight, however, to the fact that the agreement there at issue was not a will or a future grant in concluding that the agreement was not "an agreement to the contrary." We reasoned that "[t]he undisputed fact that the 1983 agreement does not fall into either category supports the district court's finding that the 1983 agreement is not 'an agreement to the contrary.' " *Id.* We discuss the sui generis nature of the agreement at issue in *Milne*, *infra*, at 8543-46.

> It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.

H.R. Rep. No. 2222, 60th Cong., 2d Sess., at 14 (1909). It is plain that the renewal process was intended to give an author and his heirs a second chance to benefit from the fruits of his labors. Professor Nimmer explains that this special treatment was accorded owners of copyright—as compared to owners of other property rights—because "the form of property designated copyright, unlike real property and other forms of personal property, is by its very nature incapable of accurate monetary evaluation prior to its exploitation." 3 M. Nimmer & D. Nimmer, Nimmer on Copyright, § 9.02, p. 9-8 (hereinafter Nimmer), *quoted with approval in Stewart v. Abend*, 495 U.S. 207, 218-219 (1990). However, the Supreme Court did not believe that the statute itself established a regime that was quite so restrictive of authors and their ability to protect themselves and, therefore, it eliminated the restraints-upon-the-author (as opposed to his heirs) rationale when in 1943, it decided *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), a case involving the popular ballad "When Irish Eyes Are Smiling." The song's author had assigned both his original and renewal rights in the copyright to a music publisher, and lived to the time of vesting of the right to renew the copyright for its second term. *Id.* at 645-46. The Supreme Court held that the assignment of the contingent renewal right was valid and enforceable, despite the rationale underlying the renewal structure itself of providing a second chance for authors.[3] *See id.* at 653-57.

---

[3]The Court did, nevertheless, later decide that if the author had transferred his renewal right but did not survive to the time of vesting, then the renewal interest would revert to his statutory successors, largely his widow or children, and the assignee of the contingent renewal interest would receive nothing. *Stewart v. Abend*, 495 U.S. 207, 219-21 (1990).

**[3]** The 1976 Act, and in particular its twin termination of transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and their heirs. Thus, with the termination of transfer provisions, authors or their heirs are able to negotiate additional compensation for previously granted rights. Without such a right of termination, the Extended Renewal Term would constitute a windfall to grantees. As stated in the 1976 Act House Report: "[T]he extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it." H.R. Rep. No. 94-1476, at 140 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5756. As the Supreme Court has explained:

> The extension of the duration of existing copyrights to 75 years, the provision of a longer term (the author's life plus 50 years) for new copyrights, and the concept of a termination right itself, were all obviously intended to make the rewards for the creativity of authors more substantial. More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product. That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). The Court elaborated further on the need for the termination provision:

> In explaining the comparable termination provision in § 203, the House Report states: "A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the

impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." H.R. Rep. No. 94-1476, at 124, U.S. Code Cong. & Admin. News 1976, p. 5740.

*Id.* at 173 n.39. The termination of transfer provision in § 203 of the 1976 Act concerns the termination of transfers and licenses granted by the author after 1978 and, significantly, includes language identical to that provided in § 304(c): "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. § 203(a)(5). In analyzing this close counterpart to § 304(c), the Supreme Court has held that "[t]he 1976 Copyright Act provides a single, fixed term, but provides an *inalienable* termination right." *Stewart*, 495 U.S. at 230 (emphasis added).

To provide additional protection for authors and their heirs from unremunerative transfers and a repeat of *Fred Fisher*, under 17 U.S.C. § 304(c)(6)(D), "a further grant of a terminated right, as well as an agreement to make such a further grant, is valid only if made after the effective date of termination." 3 Nimmer § 11.07, p. 11-41. "The [*Fred Fisher*] effect is avoided by invalidating agreements for post-reversion grants until the reversion has occurred." *Id.* § 11.01[A], p. 11-4. Thus, only once a copyright grant is terminated and the right has reverted to an author or his statutory heirs may the reverted copyright interest be effectively assigned.

In 1998, Congress reaffirmed its objectives with respect to the 1976 Act's termination provisions. The Sonny Bono Copyright Term Extension Act of 1998, effective October 27, 1998, extended the term of protection for works created prior to January 1, 1978 from 75 to 95 years. 17 U.S.C. § 304(d). This term extension was intended, once again, to benefit

authors and their heirs, and not to serve as a windfall for grantees. Accordingly, Congress coupled the extended term with a new termination right for authors and their statutory heirs, provided they had not already exercised their termination right under § 304(c). The same broadly worded "notwithstanding any agreement to the contrary" proviso in § 304(c)(5) applies to the termination provision in the Sonny Bono Copyright Term Extension Act. *See id.* § 304(d)(1); *see also* 3 Nimmer § 9.11[B][1], pp. 9-152 to 9-153.

Decisions from the Second Circuit and the Southern District of New York inform our analysis. In 1999, Joe Simon, author of the *Captain America Comics*, served a termination notice on Marvel pursuant to § 304(c). *Marvel Characters Inc. v. Simon*, 310 F.3d 280, 284 (2d Cir. 2002). The notice sought to terminate a 1969 settlement agreement whereby Simon assigned his rights in *Captain America Comics* and the Captain America character to Marvel's predecessor. *See id.* at 283-84. Marvel argued that the termination notice was ineffective because Simon had unambiguously acknowledged in the 1969 agreement that the works, many years after their creation, were "work[s] made for hire" thus making them ineligible for termination under § 304(c). *See id.* at 285. The Second Circuit found that to the extent that the retroactive recharacterization of the works in the 1969 agreement was construed to extinguish the termination right long before vesting, it was void as an "agreement to the contrary" under § 304(c)(5). *Id.* at 298-92.

**[4]** In finding for Simon, the Second Circuit affirmed that "the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract." *Id.* at 290 (citing *Stewart*, 495 U.S. at 230). The court reasoned that ruling otherwise would allow "litigation-savvy publishers" to use their superior bargaining power to compel authors to similarly recharacterize their works, thus rendering § 304(c) a "nullity." *Id.* at 290-91. According to the court, the "notwithstanding any agreement to the contrary" language

was intended to protect against attempted contractual circumvention of the termination right. *See id.* at 284, 290-91.

More recently in *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395 (S.D.N.Y. 2006), the Southern District of New York addressed the § 304(c) termination right. During his lifetime, John Steinbeck made several transfers of his copyrights, including a 1938 transfer to the Viking Press, the predecessor of Penguin Group. *See id.* at 400-01. Upon his death in 1968, Steinbeck devised the copyrights in his early works to his third wife, Elaine. *Id.* at 399. In 1994, Elaine entered into an agreement with Penguin whereby Penguin retained the same rights in the early works as it held under the 1938 agreement, but at an increased price. *Id.* at 401. The 1994 grant expressly cancelled and superseded the pre-1978 agreement. *Id.* The 1994 agreement also expressly preserved the § 304 termination rights and acknowledged that they "*could* be exercised in the future." *Id.* at 402 n.23. The court found that because the rights were assigned to Penguin in the earlier agreement that "[a]t no point did Penguin lose or gain any rights other than those originally granted to it under the 1938 Agreement." *Id.* at 401-02. The court further concluded that so far as the effect of the later agreement may be to preclude the exercise of inalienable termination rights by Steinbeck's heirs, "it [was] void as an 'agreement to the contrary' pursuant to 17 U.S.C. § 304(c)(5)" and "must be set aside as contrary to the very purpose of the termination statute." *Id.* at 402 & n.23.

**[5]** We conclude that insofar as Classic urges us to hold that the 1978 Assignment transferred the motion picture, television and radio rights subject to Mewborn's termination rights, we cannot so hold because such an assignment would be void as an "agreement to the contrary" pursuant to § 304(c)(5). Moreover, all that Mewborn had at the time of the 1978 Assignment was future rights that would revert upon

termination of the grant and the 1978 Assignment does not purport to grant those rights.[4]

[6] The 1976 Assignment transferred all of Mewborn's motion picture, television and radio rights to the Lassie Works in exchange for $11,000 and, as the district court correctly concluded, was not substituted or revoked by the 1978 Assignment but remained intact. Because LTI owned the motion picture, television and radio rights to the Lassie Works in 1978, Mewborn had nothing to transfer by virtue of the 1978 Assignment other than the additional ancillary rights she transferred for $3,000. Therefore, the language in the 1978 Assignment purporting to assign the motion picture, television and radio rights is a nullity.[5]

[7] Under § 304(c)(4)(A), a termination notice "shall be served not less than two or more than ten years before [the effective date of the termination]." The "effective date of the termination" must "fall within the five-year period" "beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later." 17 U.S.C. § 304(c)(3), (4)(A). In Mewborn's case, the fifty-six year term of copyright was set to expire in

---

[4]Although we need not reach this question, it may be possible for an author or heir to transfer the future rights scheduled to revert upon service of a termination notice, subject to surviving until the time such rights vested in the author or heir. *See* 17 U.S.C. § 304(c)(6)(B); *cf. Stewart*, 495 U.S. at 219-21.

[5]The district court misapprehended the nature of the termination right when it characterized it as an additional motion picture, television and radio right newly acquired by Mewborn. These rights are distinct. Copyright subsists in "original works of authorship," 17 U.S.C. § 101, such as the literary works at issue here. *Id.* § 102(a)(1). The copyright proprietor may contract with third parties to exploit those rights in various media such as in motion pictures, television series or over radio. These agreements—whether they are called grants, assignments or licenses—are subject to the right of authors, widows and heirs to terminate under the 1976 Act. *See* 17 U.S.C. §§ 203, 304(c)—(d); 3 Nimmer §§ 11.02[A], pp. 11-10 to 11-16; 11.02[B][1], p. 11-17.

the story in 1994 and in the novel in 1996. Mewborn could not have filed a notice of termination of the assignment of rights to exploit the story any earlier than 1984 or any later than 1997; she could not have done so for the novel any earlier than 1986 or any later than 1999. Therefore the future rights that would revert upon termination of the grant could not have vested any earlier than 1984 for the story and 1986 for the novel.

**[8]** Mewborn was entitled to effect the termination of the 1976 grant during the five year window commencing in 1994 for the story rights and 1996 for the novel rights. She was required to serve advance notice no less than two and no more than ten years before the effective date of the termination. She chose as the effective date May 1, 1998, a date that was within the termination window for both of the works—1994 to 1999 for the story rights and 1996 to 2001 for the rights in the novel. As of May 1, 1998, she validly terminated the rights she granted to LTI in the 1976 Assignment.

The district court misrelied upon *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 2969 (2006). *Milne* presented quite a distinct factual scenario with very different statutory implications. Whereas Mewborn in 1978 did not even have the right to serve an advance notice of termination so as to vest her termination rights as to the Lassie Works, and could not have served advance notice for another six years as to the story and eight for the novel, the heir in *Milne* had the present right to serve an advance notice of termination, and could exercise it at any moment. Thus when the Milne heir chose to use the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights, *see id.* at 1044-45, it was tantamount to following the statutory formalities, and achieved the exact policy objectives for which § 304(c) was enacted.

*Milne* involved the copyright interests in four Winnie-the-Pooh works, most significantly the book *House at Pooh Corner*, authored by A.A. Milne, for which he secured United States statutory copyright protection between 1924 and 1928. Copyrights in the works were duly renewed between 1952 and 1956. *Id.* at 1039. Two pre-1978 grants of rights to exploit the copyrighted works were executed.[6] *Id.* Congress then enacted the termination of transfer provision set forth in 17 U.S.C. § 304(c). *Id.* at 1040.

Under § 304(c), the heirs, specifically Christopher Milne, received the right to terminate the 1930 and 1961 grants, upon serving a notice of an effective date of termination within five year windows following the expiration of the first and renewal terms of copyright. 17 U.S.C. § 304(c)(3)-(c)(4)(A). But, under the Copyright Act, the advance notice of termination was required to be served "not less than two or more than ten years" before the effective date. *Id.* § 304(c)(4)(A). Thus, although the five year window for setting an effective date of termination for the work copyrighted in 1924 extended to 1985, for the "future rights that [would] revert upon termination of the grant [to] become vested" in Christopher, he was required to serve the advance notice no later than 1983 for that work. *See id.* § 304(c)(6)(B). If he failed to serve advance notice by that date, he would lose his right to terminate the grant for the original works, from which the later works derived. *See id.* § 304(c)(6)(F). As to the latest of the copyrighted works, Christopher similarly was required to serve advance notice no later than 1987 or lose his right of termination. In 1983, the studio, recognizing Christopher's existing right to terminate the grant of rights to exploit the original work, chose to renegotiate the pre-1978 agreements. Christopher, in turn, chose to avoid the statutory formalities whereby the rights would actually vest in him and then he would have

---

[6]A.A. Milne passed away in 1956 after executing the first grant in 1930; his widow passed away after executing the second grant together with the executor of the Milne Trust in 1961.

to renegotiate with the studio. The new agreement revoked those earlier transfers and re-granted to the studio the very same rights. In return for Christopher's agreement not to exercise his termination rights, which would have invested in him the copyright interests in all the works at issue, the deal resulted in a net gain of hundreds of millions of dollars to Christopher and the remaining heirs, landing the studio and Christopher in the same place had he followed the formalities. *Milne*, 430 F.3d at 1040-41.

In concluding that the renegotiated deal was not an "agreement to the contrary," the court relied on the facts that the new grant was more lucrative for the author's heirs, that it was freely and intelligently entered into by the parties and that "[t]he beneficiaries of the Pooh Properties Trust were able to obtain considerably more money as a result of the bargaining power wielded by the author's son, Christopher, who was believed to own a statutory right to terminate the 1930 grant under section 304(c) of the 1976 Copyright Act." *Id.* at 1044-45.

Our court in *Milne* did not find waiver or relinquishment of any right. What it did conclude was that the particular negotiated deal before it was not "any agreement to the *contrary*;" it was an agreement consistent with, and which fully honored Christopher's right of termination which could vest immediately if he served notice. As we noted, "[a]lthough Christopher presumably could have served a termination notice, he elected instead to use his leverage to obtain a better deal." *Id.* at 1045. The avenue chosen by Christopher and the studio secured the exact equivalent result for him and his fellow heirs, and in no way subverted the termination rights and the congressional purpose underlying them.[7]

---

[7]A.A. Milne's sole grandchild and Christopher Milne's daughter, Clare, was a "prime beneficiary" of the 1983 agreement entered into by her father. Still, on November 4, 2002, "motivated by the recent enactment of the [Sonny Bono Copyright Term Extension Act of 1998] and its favor-

Mewborn's predicament is a far cry from Christopher Milne's. Milne had—and knew that he had—the right to vest copyright in himself at the very time he revoked the prior grants and leveraged his termination rights to secure the benefits of the copyrighted works for A.A. Milne's heirs. Mewborn, on the other hand, would not have the right to serve the advance notice that would vest her rights under § 304(c)(6)(B) until at the very earliest six years later. Thus, unlike Milne, Mewborn had nothing in hand with which to bargain.

Examining the language of Milne's 1983 revocation and re-grant of rights in comparison to Mewborn's 1978 Assignment further underscores the different nature of the intended agreements. Unlike Christopher Milne's 1983 assignment, which expressly revoked the earlier 1930 and 1961 assignments and simultaneously re-granted the same rights, Mewborn's 1978 Assignment explicitly stated that it granted rights "in addition to" the rights granted in the 1976 Assignment and confirmed that the 1976 Assignment had been recorded in the U.S. Copyright Office. And while Mewborn's 1978 assignment was silent on the issue, the post-1978 assignment in *Milne* expressly stated that it was made in exchange for non-exercise of the immediately investative termination right.

Nor is there any evidence in the record to support a finding that Mewborn or LTI, when entering into the 1978 Agree-

able treatment of authors' heirs, Clare set out to recapture the rights to the Pooh works." *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1039, 1041 (9th Cir. 2005). The Sonny Bono Copyright Term Extension Act of 1998, codified in 17 U.S.C. § 304(d), expanded the term of copyright protection by another 20 years and provided authors and heirs with a second termination right with respect to pre-1978 copyright grants if the first right had expired without being exercised. Joined by the studio, which agreed to fund the litigation, Clare sought a declaration that her termination notice was valid. *Id.* at 1041. Because the pre-1978 grants had already been expressly revoked and Congress's purpose with respect to the termination of transfers provision had been satisfied, we found that the grants could not be terminated, affirming the district court. *Id.* at 1042-44, 1046.

ment, considered Mewborn's termination rights under
§ 304(c), or that Mewborn intended to waive or relinquish
them. Rather, the evidence suggests that Mewborn did not
intend to waive her termination rights. There is no evidence
in the record that Mewborn was even aware of her termination
rights in March 1978, just two months after § 304(c) became
effective. And if LTI had entered into the 1978 Assignment
intending that the termination right was on the bargaining
table, the contract language fails to reflect this intention or
provide any consideration for that right. There is also no evi-
dence that either party intended to revoke and replace (or even
modify) the 1976 Assignment. Rather, the 1978 Assignment
explicitly affirms the 1976 Assignment. Finally, Mewborn's
deposition testimony suggests that she had no conversations
with LTI regarding the 1978 Assignment, and that she signed
the contract "as is" without the advice of counsel and without
negotiating any of its terms.

Mewborn did not intend to relinquish a known termination
right. Because we conclude that the 1978 Assignment did not
expressly or impliedly transfer Mewborn's termination right
as to the 1976 Assignment, and that the circumstances here
are not even close to those in *Milne*, the district court improp-
erly concluded that the 1978 Assignment included a grant of
Mewborn's termination right. The 1978 Assignment simply
assigned to Classic's predecessor-in-interest the additional
enumerated rights that Mewborn had not assigned in 1976.[8]
The 1996 Termination Notice was properly served not less
than two years and not more than ten years before the effec-
tive termination date of May 1, 1998, which itself fell within
the five year window of termination for both the story and the

---

[8]It is undisputed that the 1978 Assignment is valid and enforceable with
respect to any rights Mewborn actually assigned in that agreement. This
is because the Termination Notice neither referenced nor terminated any
rights granted in 1978, nor could it have, because under § 304(c), the ter-
mination right exists for author's heirs with respect to only transfers made
before the effective date of the Act, January 1, 1978.

novel. We thus find the Termination Notice to have been valid and effective.

**[9]** In conclusion, as a matter of law, Mewborn did not relinquish her termination right via the 1978 Assignment. Accordingly, because we find that the 1996 Termination Notice was effective, any rights assigned to LTI by the 1976 Assignment reverted to Mewborn as of the effective termination date, May 1, 1998. We thus reverse the district court's order granting Classic's motion for summary judgment and direct the district court to enter partial summary judgment in favor of Mewborn on her claim for declaratory relief. Seventy years after Eric Knight first penned his tale of the devoted Lassie who struggled to come home, at least some of the fruits of his labors will benefit his daughter.

**[10]** Because we reverse the district court's decision on the cross-motions for summary judgment, Classic is not the prevailing party in its claim for declaratory relief under the Copyright Act and is not entitled to attorneys' fees. *See Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 787 (9th Cir. 2006) (quoting 17 U.S.C. § 505). Because we can affirm on any ground supported by the record, *see Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003), we affirm the denial of attorneys' fees under the Copyright Act.

Classic also argues that the district court's decision to deny its motion for attorneys' fees under the Lanham Act should be reversed because Mewborn's claim was foreclosed by established Supreme Court precedent under *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and was therefore groundless and unreasonable. Classic did prevail on the merits of the Lanham Act claim and Mewborn did not appeal.

A district court has discretion to award attorneys' fees to a prevailing party under the Lanham Act, but only in "excep-

tional cases." *See* 15 U.S.C. § 1117(a) ("The court in excep-tional cases may award reasonable attorney fees to the prevailing party."); *Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000). We construe the "exceptional circumstances" requirement narrowly. *Id.* (noting that we have interpreted the "exceptional circumstances" requirement "rather narrowly" in our decisions). "Exceptional circumstances can be found when the non-prevailing party's case is groundless, unreason-able, vexatious, or pursued in bad faith." *Id.* (internal quota-tion marks omitted); *see also Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1040 (9th Cir. 2003); *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002). Fur-thermore,

> [a] party alleging that the district court erred by fail-ing to award attorneys' fees under § 1117 faces an uphill battle. The text of section 1117 places a heavy burden of an attorney arguing that the district court abused its discretion in refusing to award attorneys' fees . . . . First, the remedy is available only in 'exceptional cases.' Second, the statute provides that the court 'may' award fees; it does not require them. Finally, the Senate Report expressly commends this decision to the discretion of the [trial] court.

*Gracie*, 217 F.3d at 1071 (internal quotation marks and cita-tions omitted).

**[11]** As the district court correctly found, Mewborn's claim involved close questions in an unsettled area of the law. The Supreme Court's decision in *Dastar* was limited to the first prong of § 43(a)(1), 15 U.S.C. § 1125(a)(1), which concerns false designation of origin. *Dastar Corp.*, 539 U.S. at 31 ("At bottom, we must decide what § 43(a)(1)(A) of the Lanham Act means by the 'origin' of 'goods.' "), 38 (noting that "one or more of the respondents might have a cause of action—not for reverse passing off under the 'confusion . . . as to the ori-gin' provision of § 43(a)(1)(A), but for misrepresentation

under the 'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)"). However, Mewborn disclaimed any Lanham Act claim other than one under § 43(a)(1)(B), the false advertising prong. Despite Classic's argument to the contrary, Mewborn's Lanham Act claim was not so obviously foreclosed by *Dastar* such that her claim was groundless or unreasonable. The district court properly denied Classic's request for attorneys' fees under the Lanham Act. We, accordingly, affirm the district court's decision.

## IV. Conclusion

For the reasons stated, we reverse the district court's order granting Classic's motion for summary judgment and direct the district court to enter partial summary judgment in favor of Mewborn on her declaratory relief claim. We affirm the district court's denial of attorneys' fees under the Copyright Act and Lanham Act.

In No. 06-55385, Mewborn's appeal of the district court's decision on cross-motions for summary judgment is **REVERSED and REMANDED** for further proceedings consistent with this opinion. In No. 06-55704, Classic's appeal of the district court's denial of its motion for attorneys' fees is **AFFIRMED**.